[No. 15628. Department One. March 30, 1920.]

## WALTER ROSKY, *by his Guardian etc., Respondent,* v. AUGUST SCHMITZ *et al., Appellants.*[1]

WORK AND LABOR (4)—SERVICES BY MEMBER OF FAMILY—CUSTODY OF DEPENDENT CHILD—IMPLIED CONTRACT—EVIDENCE—SUFFICIENCY. A dependent minor, the ward of a childrens' home, cannot recover for services rendered to a farmer and his wife to whom he was sent by the institution under an agreement the effect of which was that. he was to go to them as a member of the family and not as an employee, under stipulations intended for his benefit and putting the husband and wife in *loco parentis* as agents of the home, which retained control.

WORK AND LABOR—CONTRACTS FOR SUPPORT—BREACH—EVIDENCE— SUFFICIENCY. A minor's action for damages, sustained through the failure of the people having his custody to keep their agreement to send him to school and provide him with suitable food and clothing, is not supported by evidence that, on a few occasions, he was not given proper lunch to take to school and was discriminated against at the table, and was compelled to wear clothing that had been worn and did not look well.

Appeal from a judgment of the superior court for Cowlitz county, Darch, J., entered June 17, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract. Reversed.

*Charles J. Schnabel* and *J. E. Stone,* for appellants. *Homer Kirby,* for respondent.

PARKER, J.—The plaintiff, Walter Rosky, by his guardian *ad litem,* commenced this action in the superior

[1]Reported in 188 Pac. 493.

court for Cowlitz county, seeking recovery from the
defendants, August Schmitz and wife, upon two causes
of action. By his first cause of action, he sought re-
covery of damages in the sum of $2,500, which he
alleges he suffered from the failure of the defendants
to send him to school in compliance with the agreement
hereinafter quoted. By his second cause of action, he
sought recovery of $1,500 as the reasonable value of
his services rendered to the defendants, rested upon
their alleged failure to comply with the terms of the
same agreement, in that they failed to furnish him
proper board, wearing apparel and treatment, while
he was living with them. Trial upon the merits in the
superior court resulted in dismissal of the first cause
of action, for want of sufficient evidence to support
recovery thereon, at the conclusion of the evidence
introduced in behalf of plaintiff; and in verdict and
judgment in favor of the plaintiff, awarding him re-
covery upon the second cause of action in the sum of
$1,000. The sufficiency of the evidence to support re-
covery upon the second cause of action was challenged
by appropriate motions made in behalf of defendants,
for dismissal at the close of plaintiff's evidence, for
an instructed verdict at the close of all of the evidence,
and for judgment notwithstanding the verdict before
the rendering of judgment, all of which motions were
denied. From this disposition of the cause in the su-
perior court, the defendants have appealed to this
court. The plaintiff has not appealed from the order
dismissing the first cause of action.

The plaintiff and respondent, Walter Rosky, was
born November 20, 1897. By consent of his father in
April, 1909, his mother having died, he became a ward,
as a dependent child, of the juvenile court of Mult-
nomah county, Oregon, which court soon thereafter
committed him to the care and custody of the Children's

Home of Portland, in that county. Appellants for many years, and at all times here in question, made their home upon their farm situated in Cowlitz county, in this state, some thirty-five miles distant from Portland. Seeing a notice in a Portland newspaper that the Children's Home of that city desired to find a home on a farm for a boy, appellants wrote to the home, expressing their willingness to take the boy should they be satisfied with him upon seeing him. Thereafter, on September 22, 1911, one Stacy Matlock, representing the home, came to appellants' home bringing respondent with him. Matlock's position with the home was that of "visitor," his duties being to visit wards of the home for whom homes had been found in private families and see that such wards were being properly cared for. Matlock brought with him an agreement, evidently the stereotyped form used by the home, it being almost wholly printed, which had been signed by the superintendent of the home so as to lack only the signatures of appellants to make it complete, touching the conditions under which they could take respondent. After seeing respondent, appellants concluded to take him, when they signed the agreement and Matlock went away leaving him with them. The agreement reads as follows:

"The Children's Home
"Agreement With Custodian of Children        .

"This Agreement made and entered into this 22d day of September, 1911, by the Children's Home, party of the first part, and August Schmitz and wife, residents of Kalama, state of Oregon, [Wash.] parties of the second part.

"Witnesseth; that for and in consideration of the party of the first part agreeing to place a boy named Walter Rosky in the custody of the parties of the second part, the parties of the second part hereby covenant that they will truly and faithfully keep the fol-

lowing agreement and rules of the Children's Home, as follows:

"First. That they will send the child intrusted to their custody to school during the entire school session in their district and until said child has passed through what is known as the grammar grade.

"Second. That they will keep the child well and properly clothed.

"Third. That in case of sickness of any kind, they will see that the child receives proper medical attention and that they will be responsible for all expenses incurred during or through said sickness, or accident, and will not call on the Society for any aid whatever.

"Fourth. That they will not transfer the child placed in their custody to any other person whomsoever without the written permission from the superintendent or other officer of said Children's Home.

"Fifth. That before changing their place of residence the said parties of the second part agree that they will give notice to the said party of the first part and inform the said party of the first part of their new address, and should the said party of the first part have any objection to the community in which such parties of the second part are about to live, that the said parties of the second part will return said child to the Children's Home at Portland, Oregon, and should the parties of the second part neglect or omit to inform the said party of the first part of their intention of their change of address, that they hereby promise to pay all extra expenses incurred by the Children's Home in locating or visiting the child at this new address.

"Sixth. That the parties of the second part will allow no relatives or friends to visit the child in their custody nor will they allow the child to visit relatives or friends except by special permission from the office of the Children's Home.

"Seventh. That the parties of the second part will not allow correspondence to or from said child while in their custody except by the permission in writing of the Childen's Home.

"Eighth. That the child shall be at all times allowed to write freely to the officers of the Children's home and that it will be encouraged to do so by the parties of the second part.

"Ninth. That the Children's Home shall have the right to visit said child by means of the authorized agent or any of its officers at all times, and shall have opportunity to private interviews, if deemed necessary. And that the name of the child will not be changed without the written consent of said Children's Home.

"Tenth. That at any time, from any reasonable cause, the said parties of the second part shall become dissatisfied with the child in their custody, they will return the said child to the Children's Home at Portland, Oregon, at their own expenses.

"Eleventh. That at any time should the Children's Home by its managers or officers desire to return the said child for any cause whatsoever, the parties of the second part hereby promise to surrender the said child to the officers of the said Children's Home, provided that the Children's Home furnish the necessary transportation for the return of the child.

"In general, the parties of the second part promise to treat the said child intrusted to their care as nearly as possible as if it were their own child.

"The Children's Home,
"By Mrs. E. W. Matlock, Supt.,
"Party of the first part.
"August Schmitz,
"Wilhelmina Schmitz,
"Parties of the second part."

It will be noticed that respondent was then not quite fourteen years old. He wrote to the home several times while at appellants' home and was visited there at least once by the home's visitor. In May, 1916, when he had been at the home of appellants about four and one-half years, and when he was about eighteen and one-half years old, he left the home of appellants of his own accord, having notified them a few days prior that he was going to leave. Appellants

did not try to keep him from going. They gave him a
little money then. He went to Portland and visited
the Children's Home, and also his father, who had
married again and had a home in Portland, and has
apparently since then made his home with his father,
except for a time during the late war, when he was in
the service of the United States as a marine soldier,
from which service he was honorably discharged. He
commenced this action in November, 1917. The trial
was had commencing May 7, 1919, resulting in the
judgment already noticed, being rendered on June 17,
1919. The record before us, we think, leaves no room
for controversy over the foregoing facts. Other facts
will be noticed as we proceed.

Counsel for appellants contend that the trial court
erred in denying their motions challenging the suffi-
ciency of the evidence to support any recovery upon the
second cause of action, and in refusing to deny the re-
spondent recovery, as a matter of law, upon that cause
of action. It hardly needs argument to demonstrate
that the written agreement above quoted does not call
for the paying to respondent anything in the nature
of wages for his services to be rendered to appellants.
That the agreement contemplated that respondent
should go into the home of appellants as a member
of their family, and not as an employee for hire, is
too plain to admit of argument to the contrary. It is
well settled law that a minor living in a home, even
in the home of strangers, as this agreement contem-
plated respondent should live in the home of appel-
lants, acquires no right of compensation for services
rendered, in the sense of wages for hire. The general
rule is well stated in 20 R. C. L. 593, as follows:

"One who takes an orphan or destitute child into
his home and treats it as a member of his own family,
educating and supporting it as if it were his own child,

is said to stand to the child *in loco parentis*. While that relation continues, he is bound for the maintenance, care and education of the child, and entitled to its reasonable services without pay, in the same manner as an actual parent.''

The argument made in respondent's behalf is, in substance, that the agreement between appellants and the Children's Home was for his benefit, and that appellants breached the agreement, and therefore an implied contract for hire arose, entitling him to wages measured by the reasonable value of his services rendered to appellants while he was at their home. There may be a sense in which the agreement was made for respondent's benefit, but we fail to see wherein it made their relation between him and appellants any different, so far as his legal rights are concerned, than that which existed between him and the home. In view of the fact that, by the terms of the agreement, the home retained the right of visitation and the right to respondent's return to the home ''for any cause whatsoever,'' and the fact that the agreement contained no stipulation rendering either the appellants or the home bound for any specified time, it seems plain to us that the agreement did nothing more than make appellants the agent of the home, and that they stood in *loco parentis* to respondent, the same as the home did; or, it might better be said, that they merely shared that relation with the home so long as the home permitted respondent to remain with them.

This is not a case of seeking recovery for anything of a tortious nature committed by appellants against respondent. Indeed, his own testimony shows conclusively that he never received any corporal punishment of any nature at the hands of either of appellants. Nor is there any claim that his health was in the least impaired as a result of overwork or any other

cause while with appellants; indeed, his being received in the soldier marine service of the United States not long after leaving the appellants, and the undisputed facts showing him to be at all times a strong healthy boy negatives any such thought. Nor can any claim now be made rested upon the alleged failure of appellants to send him to school, since that claim was decided against him by the superior court, which decision is not appealed from, yet his counsel in their brief seem to have a good deal to say about the failure of appellants to send him to school. In their last analysis, the claims now to be considered in respondent's behalf, and all that the verdict and judgment have to rest upon, are simply that he was not furnished proper food and clothing, and that he was required to work too hard while residing with appellants. The incidents testified to to show that he was not given proper food are, to our minds, quite too insignificant to entitle him to base any legal right thereon. There was testimony indicating that, at a few times, he was not given proper lunch to take to school, and that, on a few occasions, he was discriminated against, as he claims, at the family table. As to the nature and extent of the clothing furnished him, the evidence is somewhat in conflict, but according to his own story, there was practically nothing lacking in his clothing so far as comfort was concerned, his complaint seeming to be that it was for the most part clothing which had been worn by the older children of the family and did not look well. This, to our minds, is in substance all that can be made out of his own version of want of proper food and clothing. We note that while appellants had a fairly good farm, it was in a somewhat isolated country in the hills where opportunities for pleasure and recreation, other than hunting and those outdoor pleasures which boys usually like, were in a considerable measure

lacking. We do not overlook the fact that the work upon the farm was somewhat hard and trying to a boy of his age, though, as already noticed, it was not such as to in the least impair his health. Indeed, looking at all the evidence, one cannot escape the conclusion that his good health and the vigor of his physical makeup were promoted by the kind of life he was leading upon appellants' farm. It is hard to escape the conclusion that he went away at the time he did because of his arrival at a time in life when it became apparent to him that he could go out into the world and make his own living in an independent way, and thereby acquire more of the things in life which he desired than he could as a member of appellants' household.

There has not come to our attention any decision of the courts wholly parallel with the situation that is here presented. The decision of the Rhode Island court in *Blivin v. Wheeler*, 25 R. I. 313, 55 Atl. 760, is about as nearly parallel as any to be found. In that case the plaintiff, a girl, whose father was dead, went into a family when she was nine years old, and continued to live there seven years. She sought recovery for her services rendered, because she claimed that they were such as one of her age ought not to be required to render. She went into the family of defendant by consent of her mother. It was held that she could not recover for her services, though she may not have been treated in all respects as she ought to have been, in so far as the work she was required to do was concerned. The agreement between the mother and the foster parent was "for a home, care, clothing and schooling." Disposing of the contention that she was not entitled to recover for her services, Chief Justice Stiness, speaking for the court, observed:

"The plaintiff invokes the doctrine that the law is tender in regard to infants, and that courts will look closely to their protection. We fully concur with this statement, which shows, at the same time, the principle upon which the right of action is cases of this kind is denied. Infants, deprived of a home by the death, misfortune, or vice of parents, stand greatly in need of sheltering care in a private home, rather than be sent as paupers to a poor-house. But people would be very shy in so taking children if they were to be liable afterwards to an action for services if the children thought, or were lead to think, that they had not been properly treated. Without doubt there may be cases where a child will be unkindly used and excessive work required. So there are such cases between parents and children. The remedy, however, is not in an action for services. In the case before us, the plaintiff could have been removed from the defendant's house at any time, if her treatment was not satisfactory. At the times when she left, she returned voluntarily and with the consent of her mother, and after her marriage she and her husband went to live with the defendant—a fact well-nigh incredible, if she had been treated by the defendant as she now claims.

"We are therefore of the opinion that the plaintiff neither had the right to sue, nor did she show a cause of action. In view of this conclusion a new trial would be useless, and the cause is remitted to the Common Pleas Division with direction to enter judgment for the defendant."

That decision was the reversal of the judgment rendered upon a verdict of a jury. In *Wyley v. Bull*, 41 Kan. 206, 20 Pac. 855, we have a case somewhat like this. In that case the child went to the home of a stranger under a contract made between its uncle and the stranger, its father and mother being dead. The court regarded the contract as void in law, though considered it as some evidence of the relationship existing between the child and its foster parent. In disposing of the claim of the child that it was entitled

to compensation for services rendered whije so living with its foster parent, Justice Valentine, speaking for the court, said:

"Of course the contract made in the present case between the plaintiff's uncle and the defendant, that the plaintiff should reside with the defendant as one of his family for nine years, was void under the statute of frauds. None of the parties was bound by it; and each had a right to treat it as a nullity; but the plaintiff did live with the defendant seven years as a part of his family, and the aforesaid void contract was some evidence as tending to show the exact *status* or relation that existed between the plaintiff and the defendant while the plaintiff so lived with the defendant, and as the contract was not binding upon anybody, and as no binding contract was ever made between the defendant and the plaintiff, or between the defendant and the plaintiff's uncle and guardian, the relation existing between the plaintiff and the defendant was one which they permitted to exist merely by sufferance, and each had a right to annul it at any time. It was therefore wholly immaterial as to which, the plaintiff or the defendant, was at fault at the time when the plaintiff and the defendant severed their relations with each other, and when the plaintiff ceased to further reside with the defendant. While they lived together they did so as parent and son, being mutually beneficial to each other, and neither expected any additional compensation, and neither can now recover any such additional compensation."

It may be that this agreement is not void, but we think it can be well said that it amounted to nothing more than evidencing the sharing of the relation of *loco parentis* by appellants with the Children's Home, and that it did not place upon appellants any greater obligation than that which rested upon the home, and that, in view of the want of stipulation as to the time respondent was to remain with appellants, the reserving of the right of visitation by the home, and the right

to the return of him to the home "for any cause whatsoever," the obligation of appellants to respondent was no more than as if no express agreement had been made.

We are of the opinion that respondent cannot recover in this case, and that the trial court erred in refusing to so decide, as a matter of law, in compliance with the motions made in that behalf by counsel for appellants. The following authorities, though not all exactly in point, lend support to our conclusion: *Walker v. Taylor,* 28 Colo. 233, 64 Pac. 192; *Brown v. Yaryan,* 74 Ind. 305; *Thorp v. Bohman,* 37 Mich. 68, 26 Am. Rep. 497; *Smith v. Johnson,* 45 Iowa 308; *Howard v. Randolph,* 134 Ga. 691, 68 S. E. 586, 29 L. R. A. (N. S.) 294; *McBride v. McGinley,* 31 Wash. 573, 72 Pac. 105; *Hodge v. Hodge,* 47 Wash. 196, 91 Pac. 764, (See also note to same case in 11 L. R. A. (N. S.) 887).

The decisions particularly relied upon by counsel for respondent are *Clasen v. Pruhs,* 69 Neb. 278, 95 N. W. 640, and *Ottoway v. Milroy,* 144 Iowa 631, 123 N. W. 467. A critical reading of these cases will show that the recoveries therein sought were rested upon tort committed against the child, which plainly is not this case.

We conclude that the judgment must be reversed and the action dismissed. It is so ordered.

HOLCOMB, C. J., MAIN, MITCHELL, and MACKINTOSH, JJ., concur.