OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
When do "extraordinary circumstances” and the best interests of the children dictate that custody be awarded to a "psychological” mother rather than a natural father? This is the initial question presented by this action for divorce in which the stepmother seeks custody of two boys, age 15 and I6V2 years, sons of her separated husband.
Another significant issue presented was the proper role of the infants in this proceeding which vitally affects their lives.
0
THE LAW
It is not possible to consider the custody issues presented here without reference to the recent landmark decision by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543 [hereafter Bennett]). Although that decision dealt specifically with the rights of a natural parent to the return of a child informally placed in foster care, the principles announced are equally applicable to the present situation.
As stated by Chief Judge Breitel: "The State may not deprive a natural parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances.” (Bennett, supra, p 544.) While the court reaffirmed the principle that the natural parent has no absolute right to custody and that the child’s rights and interests are paramount, it held that courts are powerless to supplant and displace the natural parent, absent such extraordinary circumstances drastically affecting the welfare of the child. (Bennett, supra, pp 546-549.)
Consequently, only if the threshold finding of extraordinary circumstances is first made may the court proceed to determine the best interests of the child. (Bennett, supra, p 549.) The best interests of the child, in turn, are not determined merely by the relative backgrounds, characteristics, and affec *187 tion of those seeking custody, but the court must also take into account society’s judgment with respect to the values of the family and parenthood. (Bennett, supra, p 549.)
Finally, in determining the best interests of the child some consideration must be given to the wishes of the child, himself, as well as any available psychiatric or psychological expert opinions. (Bennett, supra, pp 546, 549.)
Thus, while extraordinary circumstances may permit the court to intervene in the relationship between the natural parent and the child, these very circumstances do not per se determine to whom the custody of the child should be granted, whether to one of the contending parties or to an independent third party.
FINDINGS OF FACT
1. HISTORY AND PRESENT CUSTODY
John married his first wife, Jane, in 1957. Their two boys, Bob and Norm, were born in 1961 and 1962, respectively. In 1968 John separated from Jane and the boys and in 1969, the parties were divorced with Jane being awarded custody of both boys, without any contest by the father although he did know Jane had a drinking problem. At that time, all of them lived in California and John visited his sons on a regular basis.
In 1969, John married his present wife, Mary, and moved to New York. At the time of the marriage, the children spent two weeks with John and Mary and, during the next two • summers, the boys visited them in New York. At the end of the second summer vacation, John and Mary decided, with the boys, that they would remain in New York, which they did in spite of some efforts by Jane. Almost from the first, the boys lived in a small apartment in the same building, separate from John and Mary, which still continues. In 1975, Jane, the natural mother, died.
In June, 1976, after several years of marital problems, John moved out of the apartment he shared with Mary. Since that time, the boys have remained with their stepmother, Mary, who took over their responsibility but who did not legally adopt them because she was unable to obtain the requisite consent of their father. In September, 1976, John commenced this action for divorcé and custody of the two boys.
*188 2. FATHER — JOHN
John, 43 years old, is employed as a writer for an advertising agency. He appears to be extremely self-centered, being primarily occupied with his business, personal possessions (such as his boat, bicycle, books, and an automobile) and his own activities. In fact, his conversations with the other three members of the family over the past year and a half, have consisted principally of queries about his physical possessions.
His relationship with his wife, and ofttimes with his sons, appears to range from passiveness to disinterest. Since the boys joined his household and moved to New York, he has exhibited little or no interest in their education, religious training, physical or general well-being. Most decisions with respect to their upbringing were left to Mary. While living together as a family unit, he very often came home late and, while with them, paid little attention to the boys nor did he join in their activities on weekends or vacations. Since he moved out, about IV2 years ago, in spite of apparent sufficient financial means, he has not supported his wife or children. He has made only minimal token attempts to visit or speak with them, which they have rejected, and he was unaware of which schools they attended the past year. In sum, he fails to relate to his children on a mature level and rather than trying to breach the wall that separates him from the boys by engaging on an inter-personal level in pleasant activities with them or giving them presents, his reaction has been hostile in trying to punish and threaten the boys for failing to see him.
Three specific incidents are worth noting in this regard:
1. Although the boys received no financial aid directly from their father, they have been receiving monthly social security survivor payments of $225, as dependents of their deceased mother. At one point, after he moved out of the house, John sent them a note, advising that he was withholding that money as a protest to their decision to stay with Mary and not see him. Eventually, Mary, over John’s objection, arranged with the Social Security Administration that the checks be sent directly to her.
2. The father conceded that his sister, rather than his sons, was the named beneficiary of most of his life insurance.
3. When asked by the court whether he had plans if awarded custody, in view of their hostile and almost obdurate attitude towards him, he was unable to give a response.
*189 3. STEPMOTHER — MARY
Mary, 40 years old, is a member of the Bar who has been unemployed for some years but was previously employed as an attorney in various capacities. She also taught elementary school a number of years ago.
This is her third marriage, both prior marriages having terminated in divorce. In addition, while a teenager, she had spent a year and a half living in a Jewish Family Service home.
Mary has had a very disruptive life and appears to rely on the boys for emotional support (which is mutual). While she has undergone various forms of psychotherapy for many years, she is apparently capable of functioning satisfactorily at this time.
In terms of day-by-day matters, she assists the boys with their homework, confers with their teachers on a regular basis and has assumed the responsibility of providing general parental supervision for them. She is very concerned about their welfare, spends a great deal of time with them and considers herself their "mom”. There is every reason to believe she loves them as much as she says.
4. THE BOYS — BOB AND NORM
(a) ROLE AS SUBJECTS OF CUSTODY PROCEEDING
(Since the boys are almost adults and expressed deep concern and a continuing and real interest in the progress and outcome of this trial, they were treated and designated by the court as parties for all practical purposes.)
The boys, 16 Vi and 15 respectively, testified and were present almost throughout the entire trial. They are bright, articulate and quite mature. The boys expressed love and gratitude toward Mary and offered many pertinent examples of her concern and interest in their well-being. As a matter of fact, Norm referred to her as a "concerned person”, and he defined this term "concerned” as meaning "love” to him. Both consider her to be their "mom” and in spite of the numerous family upheavals they have undergone, they appear to have made satisfactory operating and emotional adjustments.
However, the boys do feel abandoned and neglected by their father. This sentiment has deep roots in that they are very sensitive to the fact that he left them eight years ago, when they were quite young, in the custody of their biological mother in California, who had a drinking problem and neglected them. He made no serious efforts to maintain contact
*190 with them during a period of time when they lived with her and he lived in New York. At this point, they feel doubly abandoned since their father again has moved out of their life a year and a half ago without a struggle when he left them with Mary, leading to such a strong resentment that they have completely rebuffed his recent attempts to communicate with them. Further evidence of the intensity of their feeling is the unequivocal statements they made that, irrespective of the determination of this court, they will have nothing to do with their father in the future.
They also harbor strong resentment that their father has not supported them financially, compelling them to live on Mary’s savings and their earnings from their part time after-school jobs.
Both their home environment and their education appear to be satisfactory.
(b) ROLE AS PARTIES TO CUSTODY — LEGAL REPRESENTATION
The active roles played by the boys in this proceeding were atypical and deserve comment.
At Mary’s suggestion, they contacted and retained Marcia Robinson Lowry, of the New York Civil Liberties Union Children’s Rights Project, as their attorney in representing their interests before the court. They were represented without charge, which also included the expenses of a psychiatric expert to testify on their behalf.
(The independent, vigorous and highly competent representation provided by Ms. Lowry merits the praise and appreciation of the court.)
For all practical purposes, the boys were treated as real parties in that, as parties, they remained in the courtroom throughout the trial except when, after consulting with their counsel, they elected not to attend. Their counsel was permitted to call their own witnesses and cross-examine other witnesses, including their father and stepmother.
5. PSYCHIATRIC TESTIMONY
Three psychiatrists testified during the course of this proceeding. While recognizing that reliance on such experts can be improper if "too obsequious or routine” (see Bennett, supra, p 549), or if they are obviously primarily partisan, the opinions they provide can be helpful in either confirming the court’s own observations, on the one hand, or suggesting that circumstances may not be as they appear, on the other.
*191 Where, as here, claims of brainwashing or undue influence have been raised, these reports and opinions may provide evidence to aid in determining whether the infant’s attitudes have developed as a severe reaction to a single or limited set of events or a long-time pattern.
(a) DR. A
The first psychiatrist, Dr. A testified on behalf of the children on the basis of having only interviewed the boys — no other parties. Thus, the weight accorded to his testimony reflects the fact that he was retained by interested parties and his inability to confirm their statements by independent means.
His findings were that the boys are mature and function quite well at an appropriate development level. They love, admire and trust Mary. By contrast, the boys feel emotionally and physically abandoned by their father whom they no longer trust. He concluded that awarding custody to John would be very disruptive to their lives and detrimental to their development. He opined that boys this age need a single strong parent to make decisions and that Mary adequately fulfills this role.
Finally, Dr. A observed that the boys have emotional scars, resulting from their traumatic childhood and that while they have been able now to adjust their lives and function well in the family unit with Mary, any change could be traumatic and reopen the scars..
(b) dr. B
All four parties were examined by Dr. B, who had been selected as an impartial psychiatrist, at the instigation of the court.
Her conclusions may be summarized as follows:
John has a character disorder with predominately narcissistic features. He measures his life in terms of objects and has a diminished capacity for introspection and realistic problem solving. His motivation for pursuing custody does not appear to be the children’s best interests.
Although Mary had a severely delayed emotional maturation and a maladaptive lifestyle, she has developed to an appropriate level with a capacity for insight and decision making. She is capable of providing adequate parenting for the boys and her motivation is their best interests.
The boys are functioning well in the present family unit. *192 There is a definite psychological parent-child relationship, which must be maintained. Mary would be the only proper custodian of the two.
(c) dr. c
John produced Dr. C, a psychiatrist, who had only interviewed him, for a short period of two and one-half hours, a few days before he testified. He had examined Dr. B’s report.
On the basis of his admittedly limited knowledge of factors in the case, he could not express an opinion with respect to custody, but did disagree with Dr. B’s conclusions regarding John’s capacity for introspection and problem solving. He conceded that some of John’s performance in his interview may have been an attempt to counter the findings of Dr. B.
6. PSYCHOLOGICAL PARENT-CHILD RELATIONSHIP
As a general rule, the legal right of a natural parent to the custody of a child is superior to that of any other person. However, it is equally clear that the welfare of the child is superior to the claim of the parent so that the right of the natural parent must yield where it clearly appears that the child’s welfare requires that custody be granted to another.
As suggested by Judge Fuchsberg, in his concurring opinion in Bennett (supra, pp 553-554), the presumption that, absent extraordinary circumstances, a child should be in the custody of the natural parent, should be rebuttable where the child has developed a secure, stable and continuing parent-child relationship with a third party who has become a psychological parent.
This concept, of a psychological parent-child relationship, has gained increasingly greater acceptance in the courts where the phenomena have been observed at close hand and where psychiatric experts have testified to its being well grounded and significant. (See Matter of Bennett, NYLJ, May 26, 1977, p 14, col 6; Matter of Patricia A. W., 89 Misc 2d 368; Matter of Catherine S., 74 Misc 2d 154.)
Where such a psychological parent-child relationship has developed, disruption of this relationship can be even more traumatic and devastating on occasion than severing the tie with a natural parent.
The psychological parent-child relationship in this case is extremely strong. Whether developed because of the normal loving interaction between Mary and the boys or as the result *193 of a severe reaction to the perceived abandonment by both natural parents, the result or "bottom line” is the same.
In this regard, it should be noted that Dr. B, the impartial psychiatrist who examined all of the parties, concluded that: "[Mary] has been the nurturing figure in [the boys’] otherwise deprived lives, and is unquestionably their psychological parent, as they are her psychological children. To break this family bond could only have disastrous effects on all three.”
Finally, the court is aware of the decision of People ex rel. Moffett v Cooper (63 Misc 2d 1005), in which the Family Court, Dutchess County, under facts somewhat similar to those here presented, held that it was legally bound to return custody to the natural father. That case, which has been strongly criticized (23 Syracuse L Rev 683-685), may be distinguished on the grounds, inter alia, that the court there found that the father had not abandoned his children and that he was fit to assume the duties and privileges of parenthood.
CONCLUSION
On the basis of all of the evidence presented, I find that the defendant has met her burden of proving: (1) extraordinary circumstances; and (2) that the best interests of the children require that exclusive custody be awarded to her, with appropriate visitation to the plaintiff. This conclusion is supported by the following factors, inter alia:
(1) The boys have been "abandoned” by their father on at least two prior occasions, namely, when he left them in 1969 with their biological mother and in June, 1976 when he left them with their stepmother.
(2) There has been a relatively extended period of custody with the stepmother and virtually no contact with the boys’ father for a year and a half.
(3) Their father-son relationship is almost nonexistent, at this time. While it may possibly be revived in the future, an award of custody to the father at this time, would be detrimental to its re-establishment in light of their strong antagonism to him.
(4) The boys do have a real attachment to the stepmother and a viable bilateral relationship.
(5) The boys vigorously and without qualification have a stated preference that custody be awarded to their stepmother.
*194 (6) The stepmother has demonstrated an ability to make decisions in the children’s best interests in matters materially affecting their lives.
(7) The father has demonstrated an unwillingness or, probably, an inability to make such decisions and, due to his present relationship with the boys, they do not respect his decisions or apparently, him.
(8) The stepmother is maintaining an adequate and organized living environment for the boys while the father has expressed no plans to do so.
(9) The boys, who are both very intelligent and quite mature, will both attain majority within a short period. Although the court recognizes that awarding custody to the nonparent, who may not legally adopt them, leaves the boys in a possible state of limbo, this will be resolved shortly when they reach majority.
(10) In spite of a childhood with many trauma, the boys have, nevertheless, adjusted to their present situation and any change, now, has the great potential of extreme emotional damage to them.
DECISION
Custody is hereby awarded to the stepmother, Mary. This shall be embodied in the final judgment to be entered herein.