[No. 3467-4-III.  Division Three.  March 19, 1981.]

*In the Matter of the Marriage of* MYRNA JEAN
ALLEN, *Respondent, and* JOSEPH LEE
ALLEN, *Appellant.*

David A. Gittins, for appellant.

Jay R. Jones, for respondent.

MUNSON, J.—The trial court described this case as follows: "This has been a most novel case to hear; this case is unique in my experience . . . It is an exceedingly difficult case to decide." The sole issue here concerns the custody of Joe Allen's son, Joshua. The son, born of a prior marriage, was 7 years old at the time of trial and has been deaf since birth. The court awarded custody to Myrna Jean (Jeannie) Allen, the stepmother. As will be noted, the case presents some unique procedural, as well as factual, facets. We affirm.

Unfortunately, when a family is emotionally torn asunder, often the courts remain as the only means of resolving the future relationships of the parties. Judges are sometimes asked to exercise Solomonic wisdom in these matters. *Warnecke v. Warnecke*, 28 Wn.2d 259, 182 P.2d 699 (1947); *In re Marriage of Murray*, 28 Wn. App. 187, 191, 622 P.2d 1288 (1981); *Painter v. Bannister*, 258 Iowa 1390, 140 N.W.2d 152, *cert. denied*, 385 U.S. 949, 17 L. Ed. 2d 227, 87 S. Ct. 317 (1966).[1] We affirm, believing unique circumstances may warrant unique custody decrees. *Snell v. Snell*, 361 So. 2d 936, 939 (La. App. 1978).

Joe and Dana Allen married and during that marriage a child, Joshua Edward Allen, was born September 11, 1971. Upon divorce, custody of Joshua was placed with Dana. Joshua was profoundly deaf and as a result had not learned to speak. As can well be expected, both natural parents went through a period of emotional trauma, feelings of depression, guilt and almost accusatorial concern about each other's ancestry, but had reconciled themselves to Joshua's condition. Notwithstanding, Dana was unable to

---

[1] *In re Becker*, 87 Wn.2d 470, 477, 553 P.2d 1339 (1976), in commenting on *Painter* stated: "Too, the courts must avoid merely engaging in the comparison of differing life–styles."

adjust to the situation. She placed Joshua with her mother in Coeur d'Alene, Idaho, and subsequently signed a custody modification transferring custody of Joshua to his father. Joe left Joshua with Dana's mother, who was instrumental in getting Joshua into a beginning deaf program. About this time, Joe had met Jeannie who had previously been married and had three children born in 1964, 1965 and 1967, respectively. Joe and Jeannie were married August 26, 1974, and during this marriage, Joe adopted Jeannie's three children. These children's natural father had not been involved in their rearing and was living on the East Coast at the time.

For reasons not of record and irrelevant to this appeal, Joe and Jeannie realized their marriage was irretrievably broken. Joe moved out of the house, and on April 10, 1978, Jeannie petitioned for dissolution of the marriage. In that petition, among other things, she asked to be awarded custody of all four of the children, including Joshua, whom she had never adopted.[2] Initially, Joe may have intended to take Joshua with him, but was unable to find suitable housing. Hence, Joshua remained with Jeannie during the pendency of the action, including this appeal.

Prior to trial, Joe moved for summary judgment, testing Jeannie's standing and the court's jurisdiction to award her custody of Joshua. The motion was orally denied, but no order adopting that oral opinion was ever entered. The court had ordered an evaluation of both Joe and Jeannie's capacity as parents; the report found both suitable parents. After trial, the court made the usual decree of dissolution, distribution of the community assets, awarded Jeannie attorney's fees and, commenting upon the uniqueness of the case, awarded her the custody of all four children. The only issue in this appeal is the custody of Joshua.

What makes this case exceptional is not only the fact that Joshua is deaf, but the dedication and effort Jeannie

---

[2]The natural mother did not consent to this adoption. Jeannie's love and devotion to Joshua is amply supported in the record.

put forth to obtain assistance for him during the marriage. The record reflects it is extremely important that deaf children receive early training, and learn sign language while they are young. Apparently the average person learns 90 percent of his basic language skills by the age of 6. For a deaf child to function normally in society, he must be given the opportunity to learn and work with language at an early age. Shortly after Joshua joined the home of Joe and Jeannie, she began to help him learn sign language. Joshua was only 3 years old at the time and his intellectual development was behind that of normal hearing children of a similar age. Jeannie worked hard to find special training for Joshua. Due to her efforts, special training was provided in the public school for Joshua, involving one–on–one tutoring by a person knowledgeable in sign language. Apparently at the time of trial it was the only such program known to exist in this state. Jeannie had taken special classes and had provided additional training and tutoring on her own. She had gone substantially in debt in order to pay for the special tools and training necessary to help Joshua learn. Her efforts have attracted the statewide attention of those interested in programs for deaf children.

The results have been dramatic. At the time of trial, Joshua, who entered school midyear, *i.e.,* January rather than the previous September, was at a level of intellectual development equivalent to that of hearing children his age. Various witnesses indicated this was remarkable for a deaf child. The reason for this remarkable development was not only Joshua's native intelligence, but also his educational and home environment which was conducive to communication in sign language. Jeannie and her three children use sign language as fluently as ordinary speech. All have the habit of "signing" everything they say in Joshua's presence, so that he participates in the conversations. Joe, too, has some sign language capability, but it is described as minimal and not at the same level as Jeannie and the other children.

Perhaps the most fundamental difference between the

parties lies in their basic personalities. Joe's attitude toward Joshua's future development is described as apathetic and fatalistic. This is not to say that Joe and his family are not concerned and interested in Joshua's development. They are. But Jeannie's actions on Joshua's behalf clearly suggest she believes Joshua has unlimited potential and that he can reach any goal, given proper help. Her dedication, devotion and determination to provide this help is almost overwhelmingly reflected in the record.

The trial court in awarding custody of Joshua to Jeannie based that decision "in part on a finding of unsuitability on the part of the father." The term unsuitability did not go to his character or to his general suitability as a parent, but was limited to this:

> [T]hat I do feel that the petitioner, in her providing of the school situation . . . and as a situation with the 3 older children with him, as a familiar relationship which they have, . . . that that special consideration is a sufficient basis for my reaching the conclusion I have reached.

The court further provided liberal visitation rights to the father, with all the children, as well as visitation on the part of the natural mother of Joshua, Dana.

I. *Court jurisdiction and standing of the stepmother to seek custody.*

Joe first contends the court was without jurisdiction to determine custody of Joshua because Jeannie's petition for dissolution did not meet the requirements of RCW 26.09.180.[3] As a nonparent she had neither alleged that the

---

[3]RCW 26.09.180:

"(1) A child custody proceeding is commenced in the superior court:

"(a) By a parent:

"(i) By filing a petition for dissolution of marriage, legal separation or declaration of invalidity; or

"(ii) By filing a petition seeking custody of the child in the county where the child is permanently resident or where he is found; or

"(b) By a person other than a parent, by filing a petition seeking custody of the child in the county where the child is permanently resident or where he is found, but only if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian.

child was "not in the physical custody of one of its parents" nor "that neither parent is a suitable custodian." This contention is correct as far as it goes. When the court heard the motion on summary judgment, which raised this very issue, the court denied the motion but never entered an order to that effect. Thus, that issue continued up to and through the trial. *Felsman v. Kessler,* 2 Wn. App. 493, 498, 468 P.2d 691 (1970). The trial court by its finding of unsuitability, inferentially deemed the pleadings amended by the proof pursuant to CR 15(b). The unsuitability of both parents, per RCW 26.09.180(1)(b), was before the court in argument and evidence; this had the effect of negating the jurisdictional issue.

More importantly, we hold that in a dissolution action the custody of all children is before the court. RCW 26.09.020[4] sets forth the allegations necessary in a petition for dissolution. Among these is the requirement that "The names, ages, and addresses of *any child dependent upon either or both spouses* and whether the wife is pregnant;" (italics ours) be set forth in the petition. RCW 26.09-.020(1)(d). RCW 26.09.050 requires that the court in entering its decree of dissolution "consider, approve, or make

---

"(2) Notice of a child custody proceeding shall be given to the child's parent, guardian and custodian, who may appear and be heard and may file a responsive pleading. The court may, upon a showing of good cause, permit the intervention of other interested parties."

[4]RCW 26.09.020:
"(1) A petition in a proceeding for dissolution of marriage, legal separation, or for a declaration concerning the validity of a marriage, shall allege the following:
"(a) The last known residence of each party;
"(b) The date and place of the marriage;
"(c) If the parties are separated the date on which the separation occurred;
"(d) The names, ages, and addresses of any child dependent upon either or both spouses and whether the wife is pregnant;
"(e) Any arrangements as to the custody, visitation and support of the children and the maintenance of a spouse;
"(f) A statement specifying whether there is community or separate property owned by the parties to be disposed of;
"(g) The relief sought.
"(2) Either or both parties to the marriage may initiate the proceeding."

provision for child custody and visitation, the support of any child of the marriage entitled to support, . . ." Thus, the legislature in amending the dissolution statute in 1973 provided the court with jurisdiction over all children "dependent upon either or both spouses . . ." RCW 26.09-.020(1)(d). This statute is notably different from, for example, the California Civil Code § 4351 (Deering), which provides in part:

> [T]he superior court has jurisdiction to . . . render such judgments and make such orders as are appropriate concerning . . . the *custody and support* of minor children *of the marriage, . . .*"

(Italics ours.) *Perry v. Superior Court,* 108 Cal. App. 3d 480, 166 Cal. Rptr. 583 (1980).

▮▮ Thirdly, we find that RCW 26.09.180, which provides that a child custody proceeding may be commenced: "(a) By a parent: (i) By filing a petition for dissolution of marriage . . ." is also applicable to cases involving stepparents where the stepparent can meet the requirement of standing in loco parentis in a matter of child custody. *In re Hudson,* 13 Wn.2d 673, 693–94, 126 P.2d 765 (1942). A person establishes a relationship in loco parentis when he proves that he intends to assume toward a child the status of a parent. *State ex rel. Gilroy v. Superior Court,* 37 Wn.2d 926, 933–34, 226 P.2d 882 (1951); *see Rosky v. Schmitz,* 110 Wash. 547, 188 P. 493, 10 A.L.R. 133 (1920); *Magnuson v. O'Dea,* 75 Wash. 574, 135 P. 640 (1913); 59 Am. Jur. 2d *Parent and Child* §§ 88, 91 (1971). While the obligation of a stepparent to support stepchildren may have been in doubt prior to the statutory enactment of RCW 26.16.205, there is no question of that obligation now. That statute makes a stepparent chargeable with "[t]he expenses of the family and the education of the children, including stepchildren, . . ." until "the termination of the relationship of husband and wife." However, that alone will not establish in loco parentis standing. There must be some showing that the stepparent intended to assume the parental responsibility. *State ex rel. Gilroy v. Superior Court,*

*supra.* There can be no doubt in this case that intention was displayed; standing has been firmly established as a fact.[5]

## II. *Standard for determining custody between parent and nonparent.*

Joe Allen contends the trial court erred in applying the "best interests of the child" standard of RCW 26.09.190.[6] This standard essentially compares the merit of the prospective custodians, and awards custody to the better of the two. This is properly applied between parents, *In re Marriage of Croley,* 91 Wn.2d 288, 588 P.2d 738 (1978), but between a parent and a nonparent, application of a more stringent balancing test is required to justify awarding cus-

---

[5]We need not reach the issue raised by Joe of whether Joshua was in his "physical custody" pursuant to RCW 26.09.180(1)(b). *See Henderson v. Henderson,* 174 Mont. 1, 568 P.2d 177 (1977); *but see Delgado v. Fawcett,* 515 P.2d 710 (Alaska 1973); *Burge v. City and County of San Francisco,* 41 Cal. 2d 608, 262 P.2d 6 (1953); *In re Marriage of Neal,* 92 Cal. App. 3d 834, 840–41, 155 Cal. Rptr. 157, 160–61 (1979); *In re Adoption of Van Anda,* 62 Cal. App. 3d 189, 132 Cal. Rptr. 878 (1976); *In re Batey,* 183 Cal. App. 2d 78, 6 Cal. Rptr. 655 (1960); *In re Adoption of King,* 373 So. 2d 384 (Fla. Dist. Ct. App. 1979); *In re Howard,* 382 So. 2d 194 (La. App. 1980); *In re Trapp,* 593 S.W.2d 193 (Mo. 1980); *Juan R. v. Necta V.,* 55 App. Div. 2d 33, 389 N.Y.S.2d 126 (1976); *Fernandez v. Rodriguez,* 97 Misc. 2d 353, 358, 411 N.Y.S.2d 134, 138 (1978); *Clark v. Clark,* 294 N.C. 554, 243 S.E.2d 129 (1978); *Hust v. Hust,* 295 N.W.2d 316 (N.D. 1980); *In re Williams,* 602 P.2d 1036, 1039 (Okla. 1979); *J.M.S. v. H.A.,* ___ W. Va. ___, 242 S.E.2d 696 (1978); *In re Adoption of Morrison,* 267 Wis. 625, 66 N.W.2d 732 (1954); *cf.* Uniform Marriage and Divorce Act, 9A U.L.A. § 401, Comm'rs Note at 194 (Master ed. 1979).

[6]RCW 26.09.190:
"The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:
"(1) The wishes of the child's parent or parents as to his custody and as to visitation privileges;
"(2) The wishes of the child as to his custodian and as to visitation privileges;
"(3) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;
"(4) The child's adjustment to his home, school, and community; and
"(5) The mental and physical health of all individuals involved.
"The court shall not consider conduct of a proposed guardian that does not affect the welfare of the child."

tody to the nonparent.

█ Great deference is accorded to parental rights, based upon constitutionally protected rights to privacy and the goal of protecting the family entity. *In re Becker,* 87 Wn.2d 470, 477, 553 P.2d 1339 (1976); *In re Luscier,* 84 Wn.2d 135, 524 P.2d 906 (1974). Parental rights are balanced by the State's interest as parens patriae in the child's welfare, *State v. Koome,* 84 Wn.2d 901, 907, 530 P.2d 260 (1975); *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973); *In re Tarango,* 23 Wn. App. 126, 129–30, 595 P.2d 552, *review denied,* 92 Wn.2d 1022 (1979); and parents' rights may be outweighed when these interests come into conflict. *In re Sumey,* 94 Wn.2d 757, 762, 621 P.2d 108 (1980); *In re Aschauer,* 93 Wn.2d 689, 611 P.2d 1245 (1980); *In re Becker, supra* at 473; *see also Parham v. J.R.,* 442 U.S. 584, 603–04, 61 L. Ed. 2d 101, 119, 99 S. Ct. 2493 (1979); *Wisconsin v. Yoder,* 406 U.S. 205, 230, 233–34, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972).

As stated in *State v. Koome, supra* at 907:

> Although the family structure is a fundamental institution of our society; and parental prerogatives are entitled to considerable legal deference, they are not absolute and must yield to fundamental rights of the child or important interests of the State.

(Citation omitted.)

█ We must now determine what factors may be found to outweigh parental rights. Clearly, parental unfitness will outweigh the deference normally given parents' rights. If the parents' actions threaten the child's welfare, the State's interest takes precedence. In *Bennett v. Jeffreys,* 40 N.Y.2d 543, 546, 356 N.E.2d 277, 387 N.Y.S.2d 821, 824 (1976), the court stated:

> Examples of cause or necessity permitting displacement of or intrusion on parental control would be fault or omission by the parent seriously affecting the welfare of a child, the preservation of the child's freedom from serious physical harm, illness or death, or the child's right to an education, and the like . . .

*See also In re Marriage of Croley, supra.* The legislature has defined parental unfitness, to some degree, in statutes relating to dependency, RCW 13.34.030, and abuse and neglect, RCW 26.44.030.[7]

Secondly, where circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent, parental rights may be outweighed. *See Turner v. Pannick,* 540 P.2d 1051 (Alaska 1975); *In re B.G.,* 11 Cal. 3d 679, 523 P.2d 244, 114 Cal. Rptr. 444 (1974); *Painter v. Bannister,* 258 Iowa 1390, 140 N.W.2d 152, *cert. denied,* 385 U.S. 949, 17 L. Ed. 2d 227, 87 S. Ct. 317 (1966); *Ross v. Hoffman,* 280 Md. 172, 178–79, 372 A.2d 582, 587 (1977); *Montgomery County Dep't of Social Servs. v. Sanders,* 38 Md. App. 406, 381 A.2d 1154 (1977); *Stevens v. Stevens,* 86 Mich. App. 258, 273 N.W.2d 490 (1978); *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980); *Spells v. Spells,* 250 Pa. Super. Ct. 168, 378 A.2d 879 (1977); *see also* Cal. Civ. Code § 4600 (Deering).

Here the trial court did not find the father unfit in the usual sense, but awarded custody under the best interests test. In this the court erred. However, we may affirm the trial court on any theory within the pleadings and the proof. *Timms v. James,* 28 Wn. App. 76, 81, 621 P.2d 798 (1980); *Frontier Lanes v. Canadian Indem. Co.,* 26 Wn. App. 342, 347, 613 P.2d 166 (1980). Accordingly, we affirm the trial court on two bases.

First, the trial court found that Joshua's future development would be detrimentally affected by placement with his father. There is ample record to support the court's findings. Joe's inadequacy in sign language and lack of opportunities for interaction and communication would set back Joshua's intellectual development.

[7]A high degree of proof is required under these statutes—clear and convincing evidence—since a permanent termination of parental rights may result upon a finding of unfitness. *In re Aschauer, supra; In re Sego, supra.* Custody is less drastic a limitation on parental rights. *In re Sumey, supra* at 763.

Second, Joshua had become integrated into the family unit formed by the marriage of Joe and Jeannie and his adoption of her three children. By the award of custody to Jeannie, the family unit remains essentially the same. Where the reason for deferring to parental rights—the goal of preserving families—would be ill-served by maintaining parental custody, as where a child is integrated into the nonparent's family, the de facto family relationship does not exist as to the natural parent and need not be supported.[8] In such a case, custody might lie with a nonparent. *See Whitlatch v. Whitlatch,* 206 Neb. 527, 293 N.W.2d 856 (1980); *Bennett v. Jeffreys, supra; Benitez v. Llano,* 39 N.Y.2d 758, 349 N.E.2d 876, 384 N.Y.S.2d 775 (1976); *Doe v. Doe,* 92 Misc. 2d 184, 399 N.Y.S.2d 977 (1977). As noted in *In re Aschauer, supra* at 697 n.5:

> [I]t was formerly thought that blood ties between parent and child were extremely important. Now it is learned that kinship is not as important as stability of environment and care and attention to the child's needs. *See* J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* (1973). These convictions may also change as further study and experience produces new insights.

In this situation, the psychological relationship between Jeannie, her family, and Joshua is equivalent to that of a natural family entity. While the relationship between Joshua and Joe will be altered by Joe's absence from the family home, extremely liberal visitation rights serve to mitigate his absence. Also, to date, both parties continue to reside in the same locale.

To summarize our holding: the "best interests of the child" test of RCW 26.09.190 compares the parents' competing home environments and awards custody, by a preponderance of the evidence, for the better environment. The only alternative currently recognized in Washington by

---

[8]The importance of this concept is recognized by the legislature in the child custody modification provisions of RCW 26.09.260, which require a high burden of proof to modify custody unless the child is integrated into the family seeking modified custody.

which a parent may lose custody to a nonparent is a finding of unfitness pursuant to the neglect and termination provisions of RCW 13.34.030 and 26.44.030. Unfortunately, such findings have a drastic consequence—they deprive the parent of all rights as to the child. Accordingly, those statutes are not applicable to custody disputes under RCW 26.09, between parents and nonparents.

The authorities cited herein suggest we must look to a middle ground; to give custody to a nonparent there must be more than the "best interests of the child" involved, but less than a showing of unfitness. In extraordinary circumstances, where placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the State's interest in the child's welfare. There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the "best interests of the child" test. Precisely what might outweigh parental rights must be determined on a case–by–case basis. But unfitness of the parent need not be shown.

We believe the facts of this case are singular and justify the trial court's decision. We conclude that Joshua's disability and Jeannie's dedication demanded that he be placed with Jeannie. By placing the child with the stepmother, along with the other three children, the continuity of that family unit could be retained. There is more to that relationship than the local school could provide, even with the tutor: the everyday living relationship between the stepmother, the three children and Joshua. Disrupting that relationship would have deeply disturbed Joshua. Joe's parental rights were properly outweighed under these facts.

Such unusual circumstances as presented here are highly prone to change; should the parties move from the community, the health of the stepmother drastically worsen, or other significant changes in the child's home and school environment occur, modification might become necessary.

Lastly, the contention is made that there should not have been an award of attorney's fees to the stepmother. We find

no abuse of discretion in this action. The wife showed need and the husband had ability to pay. Judgment is affirmed.

ROE, A.C.J., and GREEN, J., concur.