IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN THE MATTER OF THE CUSTODY OF: | ) ) ) | No. 32597-1-III |
| K.R.H., | ) ) | |
| DEBRA ELAINE CLAWSON, | ) ) | UNPUBLISHED OPINION |
| Respondent, | ) ) | |
| and | ) ) | |
| JANELLE MARIE HUNTER, WILLIAM F. MARX, | ) ) ) | |
| Petitioners. | ) ) | |

FEARING, J. — William Marx appeals the trial court's denial of his motion to

vacate a default nonparental custody decree entered against him prior to establishment of

his paternity. The decree granted custody of Marx's daughter, Katerina, to the daughter's

maternal grandmother, Debra Clawson. Katerina is a fictitious name. Marx also appeals

the trial court's denial of his petition for a major modification of the default residential

schedule. We affirm the trial court's refusal to vacate the default decree. We, however,

reverse the trial court's denial of Marx's petition for a major modification in the child's residential schedule. We hold that the trial court failed to employ the correct standard when denying the petition for a major modification. Because of Marx's constitutional right to the care of his daughter, Debra Clawson, to retain custody of Katerina, needed to show Marx to be an unfit parent or that Katerina's placement with Marx would result in actual detriment to Katerina's growth and development. We remand for further proceedings.

## FACTS

Janelle Hunter and appellant William Marx generated a child together in 2010, although Marx disclaims knowledge of his fatherhood until 2013. In December 2009 and January 2010, Janelle Hunter and William Marx enjoyed a brief corporeal affair, despite Hunter's marriage to another. Marx believed Hunter then engaged in sexual relations with two other men not her husband. Marx claims he ended the brief relationship with Hunter because of her sexual interactions with others, her possible drug use, and intervention by police. He does not explain the police involvement.

In a declaration, respondent Debra Clawson, mother of Janelle Hunter, averred that Hunter, with William Marx present, announced her pregnancy during Christmas dinner 2009. Clawson was present during the dinner. Marx denies that Hunter publicized any pregnancy at the Christmas dinner. Marx reasonably notes that Hunter gave birth to Katerina after only thirty-five weeks of gestation and more than thirty-five

2

weeks passed between Christmas and the birth, on August 25. Marx also questions whether Hunter would announce to her family that a man she met a week before already impregnated her.

On August 25, 2010, Janelle Hunter gave birth to Katerina. Hunter consumed methamphetamine while pregnant, and, as a result, Child Protective Services (CPS) removed Katerina from Hunter's side while the two convalesced in the hospital.

In an order denying William Marx's motion for reconsideration in this nonparental custody suit, the trial court entered findings of fact that mentioned events during the dependency action. The findings state that Janelle Hunter identified William Marx as the father. The findings do not disclose when or under what setting Hunter identified Marx as the father. Neither party knows if the birth certificate listed Marx as the father.

In a declaration, Debra Clawson testified that someone telephoned William Marx the day after Katerina's birth and informed him of the birth. According to Clawson, Marx summarily ended the call. Clawson did not identify the purported caller to Marx nor did she aver that she overheard the conversation. The declaration also does not indicate whether the caller informed Marx that he was the father of the child.

On August 31, 2010, the State of Washington filed a dependency action for Katerina. The record on appeal does not include the pleadings from the dependency action. In the order denying William Marx's motion for reconsideration in this nonparental custody suit, the trial court entered a finding of fact that the dependency

3

petition listed William Marx as Katerina's biological father.

On September 3, 2010, the State filed a declaration indicating that it left notice of the dependency action at Marx's last known address, 223 E. LaCrosse, Spokane. The State gained the address through a search of Qwest telephone records and the Internet. The findings in this nonparental custody action mentioned that the State "paged" Marx for a dependency hearing on October 14, 2010, and that Marx did not respond to the page. We do not know the nature of the page, whether Marx had the capability of receiving a page, and whether Marx received the page.

In a declaration in support of his motion to vacate the nonparental custody order, William Marx did not disclose whether he received notice of the dependency action or if he received a page for a hearing. In the declaration, Marx agreed he learned in early 2010 of Janelle Hunter's pregnancy. He averred that, at the time of the birth of the child, he did not believe he was the father because the child was born eight months after his first rendezvous with Hunter and because Hunter enjoyed relations with other men. Marx testified that Hunter never informed him that he was the father of Katerina.

On September 10, 2010, and after the filing of the dependency action, the State of Washington placed the two-week-old Katerina with her maternal grandmother, Debra Clawson. On November 10, 2010, the trial court entered an order of dependency for Katerina, kept the child in the care of Clawson, and granted Clawson leave to obtain a decree of nonparental custody. Our record does not contain a copy of the dependency

4

order. We do not know if the order of dependency included findings declaring William Marx unfit to parent. William Marx claims the State dismissed the dependency action because of lack of service on him. He claims the State filed a pleading stating he had not been served. We do not have a copy of the pleading in order to confirm Marx's contention.

On January 10, 2011, Debra Clawson initiated this nonparental custody proceeding, against her daughter Janelle Hunter and William Marx, for the custody of Katerina. Katerina was then three-months old. Marx had not yet been legally established as Katerina's parent. In her petition, Clawson identified Marx as "possible father to" Katerina. Clerk's Papers (CP) at 4. Clawson alleged that Marx "has never had any contact with [Katerina] or showed any interest in her." CP at 10. Clawson petitioned for limited visitation for Marx due to his alleged "[w]illful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions." CP at 9. Under a section of the nonparental custody petition titled "Best Interest of the Children," Clawson wrote: "I think being placed with family is better than being placed in a foster home." CP at 10. Clawson did not sign the petition under the penalty of perjury, despite the petition form requiring the signature.

In her proposed residential schedule filed with the nonparental custody petition, Debra Clawson proposed restricting William Marx's contact with Katerina to supervised visitations with twenty-four hours advance notice. Clawson justified the restriction with

5

Marx's willful abandonment of his daughter and his conviction of assault of a child in the third degree. In a declaration later filed, Marx admitted the State charged him with assault in 2001. Marx averred that he resolved the charge, but does not disclose the nature of the resolution or whether the State convicted him of the crime. He states that someone permitted him to see his other children on the same day as the resolution of the charge. Our appellate record does not include Marx's criminal background.

On January 10, 2011, Debra Clawson's son, Corey Clawson, appeared at William Marx's front door and handed Marx papers. In a March 2014 declaration, Marx avowed that Clawson delivered him "a couple" faded handwritten papers with portions whited out. CP at 58. Marx claimed he found no summons in the papers, although he does not explain why three years later he would remember the absence of a summons and why he would have known the significance of a summons in 2011. In his declaration, Marx further averred that he saw no case number on the papers. Marx insisted he was unaware of a need to respond to the papers or that the papers alleged him to be Katerina's father. He does not indicate if he read any of the papers, whether he recalls the content of what he read, and how and when he disposed of the papers.

Kathryn Fenley, William Marx's girlfriend, signed a declaration in April 2014. In the declaration, Fenley averred that she observed Corey Clawson serve Marx with documents in January 2011. Fenley reviewed the documents and described them as a small stack of papers "whited out and badly faded in places" and lacking the appearance

6

of "proper documents." CP at 127. According to Fenley, the paperwork lacked any summons. On January 11, 2011, Corey Clawson filed a return of service, in which he declared he served William Marx at 223 E. LaCrosse, Spokane, at 8:04 p.m., on January 10, 2011, with a copy of the summons, petition, proposed residential schedule, notice of adequate cause hearing, and a response to petition form.

Neither Janelle Hunter nor William Marx responded to Debra Clawson's nonparental custody petition. On February 3, 2011, a court commissioner granted Clawson an order of default, order on nonparental custody, order re: adequate cause, findings of fact and conclusions of law, and nonparental custody decree. One finding declared that neither parent is a "suitable custodian" for Katerina because "both parents failed to meet minimal standards of care for [the child] and failed to complete services." CP at 30. Another finding averred that the child had been "removed from parental care due to findings of neglect and/or abuse by CPS." CP at 30. A later finding stated that "it is in the best interest of [Katerina] to be placed in the custody of petitioner [Debra Clawson]." CP at 30. No finding expressly declared William Marx to be an unfit parent or averred that placement of Katerina with Marx would result in actual detriment to the child's growth and development.

The visitation section of the February 2011 custody decree read that the residential schedule will establish Marx's visitation rights. Nevertheless, the commissioner signed no residential schedule.

7

We do not know if Debra Clawson or another party sent a copy of the nonparental custody default order and decree to William Marx. On May 25, 2011, the State dismissed the dependency proceeding for Katerina.

In July 2013, either the State of Washington or Debra Clawson initiated a paternity suit against William Marx in order to collect child support from Marx. Our appellate record contains none of the suit's pleadings. On July 18, 2013, Marx submitted to genetic testing to determine whether he was Katerina's father. On October 9, 2013, Marx sent Debra Clawson a certified letter requesting visitation with Katerina. Clawson never retrieved the letter. On October 10, 2013, the State confirmed paternity of Marx through the testing. Marx does not explain why he sent his letter requesting visitation one day before confirmation of his fatherhood, if he did not believe himself to be the father. On October 30, 2013, Marx sent Clawson another certified letter requesting visitation. On November 1, 2013, Clawson collected the letter and contacted Marx to schedule visitation.

On November 2, 2013, William Marx first visited three-year-old Katerina at Debra Clawson's home. Marx visited from 1:00 to 3:45 p.m. At the conclusion of the visit, Clawson invited Marx, his son Jaidin, Marx's girlfriend Katherine Fenley, and Fenley's daughter Kessy to attend a hockey game that evening with Katerina and Katerina's half-brother, five-year-old Kayden. Marx accepted the invitation. Marx visited Katerina on November 4, 11, and 14, with Clawson present for all visits. Clawson cancelled a few

scheduled visits in November while Katerina and Kayden were sick. On November 23 and 29, 2013, Marx enjoyed two afternoon unsupervised visits with his daughter.

Katerina adjusted well to visits with William Marx until December 17, 2013, when she first resisted spending time with her father. Debra Clawson deemed Katerina "crabby" that day. CP at 90. The young girl happily visited Marx on December 18. At Clawson's offer, Katerina stayed overnight with Marx on December 25, 26, and 31.

On January 2, 2014, Debra Clawson began a new job that demanded placing Katerina in preschool from 8:00 a.m. to 5:00 p.m. every day. Because of the new schedule, Clawson ended weekday visits between Marx and Katerina. Katerina stayed overnight with Marx on January 4 and 11, and the weekends of January 18 and 25. On January 24, Katerina's uncle, Corey Clawson, and Corey's girlfriend, Danielle Bergeson, left Katerina at Marx's home. CP 105. Bergeson signed an affidavit in which she maintained that Katerina cried in the car on the way to Marx's residence on January 24 and did not want to remain with her father. Marx maintained that Katerina did not cry on January 24, but Katerina cried herself to sleep on the first night of the weekend stay and awakened in good spirits the following morning. On January 31, Corey Clawson dropped Katerina at Marx's home for the weekend. CP at 63. Katerina cried herself to sleep the first night, but remained happy the rest of the weekend.

Conflict arose between Debra Clawson and William Marx in early February 2014. According to Marx, Clawson told him she co-slept with Katerina and that Katerina

9

should not nap. Marx disagreed with Clawson's sleeping practices. Marx objected to the amount of sweets and junk food Clawson permitted Katerina. Clawson, meanwhile, claimed Marx gave the young girl a bubble bath after she told Marx that a physician advised that bubble baths caused Katerina yeast infections. Marx denied receiving this advice. Marx worried that a flooded basement in Clawson's home necessitated Katerina wearing tubes in her ears, while Clawson insisted ear infections ran in her family. Clawson and Marx both accused each other of manipulating Katerina.

On February 6, 2014, Katerina underwent the placement of new tubes in her ears. After the procedure, William Marx texted Debra Clawson to inquire of the success of the process. Clawson responded that Katerina suffered a fever and Katerina would not visit with Marx the coming weekend. Marx understood the procedure to be minor and interpreted Clawson's denial of visitation as an arbitrary interference with visits. Marx inquired why Katerina could not spend the weekend and Clawson replied that someone recommended that she allow only supervised visitation as afforded in the February 2011 residential plan. Remember that the court commissioner signed no residential placement plan or schedule.

On February 6, 2014, Debra Clawson offered William Marx a supervised visit at her house the following Friday or Saturday. Marx and Clawson then exchanged forceful text messages. Marx wrote that the law prohibited a foster parent from sleeping with a foster child and he demanded that Clawson immediately end the nighttime habit.

Clawson directed Marx not to contact her again.

The heated texts ended. On February 19, 2014, Debra Clawson proposed to William Marx a supervised visit at McDonald's on February 22. Marx accepted and appeared at the restaurant at the appointed time with his son and girlfriend. The visit ended soon because of Katerina's unwillingness to engage with Marx. Clawson maintained that Katerina's shyness resulted from her striking heads with another child in the play area. Clawson testified that she told Marx to allow Katerina time to recover from the injury. Marx maintained that Clawson interfered with the visit. According to Marx and his girlfriend, Katerina looked to Clawson for approval before interacting with them and Clawson looked with distain toward the couple.

## PROCEDURE

We arrive at the motions that are the subject of this appeal. On April 4, 2014, William Marx moved the court, in this nonparental custody action, to vacate the February 2011 default order, findings of fact and conclusions of law, and decree granting custody of Katerina to Debra Clawson. Marx argued for vacation of the order and decree, under CR 60(b), because (1) the original decree was void for lack of jurisdiction since Clawson failed to complete service of process on him, and (2) he lacked notice that he was Katerina's father until the 2013 paternity action. In the alternative, Marx sought modification to the residential schedule. Assuming the court did not order immediate placement of Katerina with him, Marx requested initial visitation from 2:00 p.m. Friday

to 9:30 a.m. Monday every week. Marx proposed a residential schedule that gradually reduced Clawson's custodial time with Katerina. William Marx did not ask for an evidentiary hearing to determine if Clawson served him with process.

Debra Clawson replied to the motion to vacate and motion to modify visitation and opposed both of William Marx's requests. Clawson argued that she effectuated service on Marx and that he failed to show detrimental treatment by Clawson of Katerina sufficient to warrant a modification of the residential schedule. Clawson contended that William Marx should have known by 2010 that he was the father of Katerina since Janelle Hunter announced her pregnancy during a dinner that Marx attended, someone called Marx a day after the birth of Katerina and announced to Marx the birth, and Clawson listed Marx as the possible father in her 2011 nonparental custody petition. Marx filed a motion to strike portions of Clawson's declaration as impermissible hearsay.

On May 5, 2014, the trial court entertained William Marx's motion to vacate. During oral argument on the motion, Marx did not request that the court conduct a hearing with oral testimony to determine if Debra Clawson effectuated service of process. The trial court denied the motion to vacate. The court deemed the motion to be late under CR 60 and found that William Marx received the summons along with the other pleadings. The trial court expressed concern about the court commissioner's failure to sign a residential plan in February 2011.

12

A day later, a court commissioner heard argument on William Marx's motion to modify the third-party custody decree. Marx argued that the establishment of his paternity created a change in circumstances warranting a modification since Debra Clawson used the terms of the residential schedule to restrict his contact with Katerina while he attempted to establish a relationship with his daughter. Marx argued he was the credible party because he readily disclosed negative aspects of his and Katerina's nascent relationship, while Clawson submitted a declaration that relied on hearsay and contradicted statements made in another declaration filed by Corey Clawson's girlfriend. Marx argued adequate cause existed for the court to conduct a full hearing on a major modification. In response, Debra Clawson contended that the trial court's statement that Marx had known for several years that he was the father established as a matter of law that Marx knew he was the father at the time of Clawson's nonparental custody petition. Clawson stipulated to a minor modification of the custody decree, but argued against a major modification.

The court commissioner denied William Marx's request for a major modification. The commissioner remarked that the standard for a major modification in a nonparental custody action was the standard applied to a major modification in a parenting plan in a marriage dissolution action. Under that standard, found in RCW 26.09.260, William Marx needed to show a substantial change in circumstances, that the child's present environment is detrimental to the child's physical, mental, or emotional health, and that

13

the harm likely to be caused by a change in environment is outweighed by the advantage to the change to the child. The court commissioner held that Marx did not fulfill the standard.

The court commissioner found that William Marx met the threshold for a minor modification, and the commissioner entered a "stair-step residential schedule." Verbatim Report of Proceedings (VRP) (May 6, 2014) at 26. The schedule removed the requirement that Debra Clawson supervise all visitation, and provided:

> For the first month, father to have every Wednesday, 3:00 pm to 7:00 pm. In addition, the father to have every Saturday, noon to 4:00 pm. After that month, providing all of the time is exercised . . . Father to have every Wednesday, 3:00 pm to 7:00 pm. Father to have every other weekend, Friday, 3:00 pm to Saturday, 3:00 pm

CP at 137.

On May 14, 2014, William Marx moved the superior court to revise the court commissioner's denial of his motion for a major modification. Marx also moved for reconsideration of the trial court's denial of his CR 60(b) motion to vacate. In his motion for reconsideration, Marx argued: "A determination of whether Mr. Marx was properly served would be a credibility determination, and Mr. Marx has demonstrated that he is the more credible of the two." CP at 141. Marx, however, did not request an evidentiary hearing to resolve the parties' credibility. The trial court denied the motion for reconsideration and the motion for revision.

## LAW AND ANALYSIS

14

William Marx's appeal opens a Pandora's jar of issues that could fill the bluebook of a bar examination. The appeal compels many questions. First, must the trial court have conducted an evidentiary hearing to resolve the credibility of Marx and his witness, on the one hand, and Debra Clawson and her witness, on the other hand, before ruling on whether Clawson served Marx with process? Second, did Clawson complete service of process in this nonparental custody petition on Marx? Third, should the trial court have stricken portions of Debra Clawson's declaration? Fourth, was William Marx's motion to vacate the default order timely? Fifth, assuming the custody decree was valid because of effective service, did the trial court abuse its discretion in denying Marx's motion to vacate the default nonparental custody decree? Sixth, did Debra Clawson's failure to sign the nonparental custody petition under penalty of perjury invalidate the custody decree? Seventh, did Marx need to file a motion for adequate cause to modify custody when the trial court never earlier entered a residential placement schedule order? Eighth, was there adequate cause under RCW 26.09.260 for a major modification in Katerina's placement? Ninth, did the trial court violate Marx's constitutional right to due process when entering a nonparental custody decree restricting contact with his daughter before establishment of his paternity? Tenth, are Marx's constitutional rights to parent infringed by requiring him to show adequate cause for a major modification of the nonparental custody decree?

We rule that William Marx was effectively served and that he may not vacate the order of default. We hold that William Marx did not show adequate cause to vacate the default order as adequate cause is defined under RCW 26.09.260. Nevertheless, we hold that, under our decisions in *In re Custody of T.L.*, 165 Wn. App. 268, 268 P.3d 963 (2011), and *In re Custody of Z.C.*, No. 32431-1-III (Wash. Ct. App. Dec. 15, 2015), and pursuant to constitutional protections afforded a biological parent, Marx did not need to show adequate cause for a major modification. We therefore vacate the order of nonparental custody in favor of Debra Clawson. Because of our holding, we need not address many of the other questions posed by the appeal's circumstances and raised by the parties.

*Issue 1: Did the trial court commit error by failing to conduct an evidentiary hearing to resolve William Marx's contention that Debra Clawson failed to effectuate service of process?*

*Answer 1: We decline to address this assignment of error since William Marx did not seek, before the trial court, a hearing with live testimony.*

William Marx seeks reversal of the trial court's denial of his CR 60(b) motion to vacate the default nonparental custody decree entered against him in February 2011. The trial court entered both an order of default and a decree in February 2011.

CR 55 declares:

**(c) Setting Aside Default.**

16

(1) *Generally.* For good cause shown and upon such terms as the court deems just, the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with rule 60(b).

In turn, CR 60 reads, in relevant part:

**(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.** On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order, or proceeding for the following reasons:

. . . .

(5) The judgment is void;

. . . .

The motion shall be made within a reasonable time.

William Marx argues that vacation of the order of default and custody decree is proper under CR 60(b)(5) because he was not properly served a copy of Debra Clawson's summons and petition for nonparental custody. He contends the trial court lacked personal jurisdiction over him when entering the order and decree.

A judgment entered in a proceeding failing to comply with procedural due process requirements is void. *In re Marriage of Ebbighausen*, 42 Wn. App. 99, 102, 708 P.2d 1220 (1985). A judgment entered without jurisdiction over the parties is void. *Lee v. W. Processing Co.*, 35 Wn. App. 466, 469, 667 P.2d 638 (1983). Proper service of the summons and complaint is essential to invoke personal jurisdiction over a party, and a default judgment entered without proper jurisdiction is void. *In re Marriage of Markowski*, 50 Wn. App. 633, 635-36, 749 P.2d 754 (1988); *Mid-City Materials, Inc. v. Heater Beaters Custom Fireplaces*, 36 Wn. App. 480, 486, 674 P.2d 1271 (1984). A

17

party may move to vacate a void judgment at any time. *In re Marriage of Leslie*, 112 Wn.2d 612, 618-19, 772 P.2d 1013 (1989). Courts hold a nondiscretionary duty to vacate void judgments. *Leen v. Demopolis*, 62 Wn. App. 473, 478, 815 P.2d 269 (1991); *Brenner v. Port of Bellingham*, 53 Wn. App. 182, 188, 765 P.2d 1333 (1989).

On appeal, William Marx notes that his testimony and the testimony of his girlfriend conflicts with testimony of Debra and Corey Clawson concerning whether Clawson served him with a summons, among other papers. Marx contends on appeal that the trial court should have conducted an evidentiary hearing to determine the credibility of the witnesses before ruling on whether he was properly served.

When a motion to set aside a default judgment is supported by affidavits asserting lack of personal service and the plaintiff files controverting affidavits, a triable issue of fact is presented. *Roth v. Nash*, 19 Wn.2d 731, 732, 144 P.2d 271 (1943); *Woodruff v. Spence*, 76 Wn. App. 207, 210, 883 P.2d 936 (1994). Under such circumstances, the court, in its discretion, may direct that an issue raised by motion be heard on oral testimony if that is necessary for a just determination. *Woodruff v. Spence*, 76 Wn. App. at 210; *Swan v. Landgren*, 6 Wn. App. 713, 495 P.2d 1044 (1972).

We need not and do not answer whether the trial court abused its discretion when failing to conduct an evidentiary hearing with oral testimony, because Marx never sought an evidentiary hearing at the trial court. He contended below that he was the more credible witness, but did not demand a trial with live testimony. We do not address

assignments of error not raised below.

RAP 2.5 formalizes a fundamental principle of appellate review. The first

sentence of the rule reads:

> **(a) Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

Good sense lies behind the requirement that arguments be first asserted at trial. The

prerequisite affords the trial court an opportunity to rule correctly on a matter before it

can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013).

There is great potential for abuse when a party does not raise an issue below because a

party so situated could simply lie back, not allowing the trial court to avoid the potential

prejudice, gamble on the result, and then seek a new hearing on appeal. *State v. Weber*,

159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278

P.3d 653 (2012). The theory of preservation by timely objection also addresses several

other concerns. The rule serves the goal of judicial economy by enabling trial courts to

correct mistakes and thereby obviate the needless expense of appellate review, facilitates

appellate review by ensuring that a complete record of the issues will be available, and

prevents adversarial unfairness by ensuring that the prevailing party is not deprived of

victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176

Wn.2d at 749-50; *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988).

By practice, trial courts resolve motions to vacate default judgments on affidavits

without live testimony. For this reason, a party seeking more and wishing an evidentiary hearing should ask the trial court for an oral hearing before raising error on appeal.

*Leen v. Demopolis*, 62 Wn. App. 473 (1991) controls. In *Leen*, this court affirmed the trial court's denial of Chris Demopolis' motion to vacate a default judgment against him for unpaid attorney fees owed to David Leen. In support of his motion to vacate, Demopolis filed an affidavit stating he found a copy of the complaint, without a summons, in his mailbox. Demopolis also filed another affidavit signed by two persons who claimed to dine with Demopolis in a restaurant at the time Leen's return of service alleged he was served. Nevertheless, Demopolis never stated that he sat in a restaurant at the alleged time of service at his home. On appeal, Demopolis argued that the lower court must hear live testimony to properly assess the credibility of the conflicting affidavits. Demopolis, however, made no request to present live testimony at the hearing on his motion to vacate. We held that Demopolis waived his argument that the trial court should have conducted an evidentiary hearing to determine witness credibility. We noted that a litigant may not remain silent regarding a claimed error and later raise the issue on appeal.

*Woodruff v. Spence*, 76 Wn. App. 207 (1994) resulted in the opposite outcome. Richard Spence filed a declaration that included the statement he was in Bellingham at the time the affidavit of service showed service occurred on him at his Renton home. Spence also provided the affidavit of his son, who declared he was at his father's

20

residence on the same date that service allegedly occurred. According to the son, no process server entered the property. Another individual declared he worked in the shop adjoining Spence's residence on the date of purported service and that he saw no one out of the ordinary coming to or going from the residence. We remanded the case to the trial court for an evidentiary hearing to assess the credibility of the witnesses. In so ruling, we distinguished *Leen v. Demopolis* on the ground that a telephone message confirmed Leen's affidavit of service and Demopolis' evidence of lack of service was equivocal.

We choose to respect the teachings of *Leen v. Demopolis* rather than *Woodruff v. Spence*. We could distinguish *Woodruff* and follow *Leen* on the basis that William Marx's evidence is incomplete and wanting. But more fundamental reasons demand conformity to *Leen v. Demopolis*.

The opinion in *Woodruff v. Spence* does not mention whether either party asked for an evidentiary hearing before the trial court. The opinion does not mention whether Richard Spence claimed error on appeal because of the lack of a factual trial. The *Woodruff* court did not address the question whether a party waives a hearing with live testimony by failing to demand one before the lower court.

*Leen v. Demopolis* applies a principle critical to the efficient functioning of the court system. In addition to the rationales for RAP 2.5 listed above, the state's busy trial courts deserve the opportunity to address a party's argument before an appellate court reviews whether the court should have accepted an omitted contention. Trial courts know

21

the intimacies of a case better than reviewing courts and that knowledge affords the trial courts a better occasion to address an argument in the first instance. William Marx should have first granted the trial court an opportunity to exercise discretion as to whether an evidentiary hearing would be helpful.

*Issue 2: Did the trial court err when ruling that Debra Clawson consummated service of process on William Marx?*

*Answer 2: No.*

Corey Clawson filed a return of service under oath that declared he served William Marx with the summons, petition, proposed residential schedule, notice of adequate cause hearing, and a response to petition form. An affidavit of service, regular in form and substance, is presumptively correct. *Lee v. W. Processing Co.*, 35 Wn. App. at 469 (1983). The return, however, is subject to attack and may be discredited by competent evidence. *Lee v. W. Processing Co.*, 35 Wn. App. at 469.

This court reviews a trial court's decision on a motion to vacate an order of default or default judgment for abuse of discretion. *Morin v. Burris*, 160 Wn.2d 745, 753, 161 P.3d 956 (2007). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. *Morin*, 160 Wn.2d at 753. A decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported in the record or was reached by applying the wrong legal standard. *Mitchell v. Wash. State Inst. of Pub. Policy*, 153 Wn. App. 803, 821-22, 225 P.3d 280 (2009). A party that moves to vacate a default

22

judgment based on improper service has the burden of proving the same by clear and convincing evidence. *Leen v. Demopolis*, 62 Wn. App. at 478 (1991).

William Marx and his girlfriend agree that Clawson appeared at Marx's home and served papers. One must question why Corey Clawson would travel to Marx's home and only deliver partial papers. Corey Clawson completed a declaration in which he listed a summons, petition and other pleadings. One must question how Clawson knew of the nomenclature for these pleadings without having them in his possession to serve.

William Marx and his girlfriend deny that Marx received a summons. Nevertheless, they fail to disclose the identity of the pleadings served on them. Marx omits any mention in his declaration of whether he read the papers and how he disposed of the papers. Based on this record, the trial court did not abuse its discretion when ruling that William Marx was properly served with the summons and petition.

*Issue 3: Did the trial court err by refusing to strike hearsay testimony in Debra Clawson's declaration?*

*Answer 3: We refuse to address the issue since any hearsay testimony did not impact the outcome of the hearings below and does not influence the result of this appeal.*

William Marx complains that Debra Clawson, in a declaration, testified that someone called him the day after Katerina's birth to inform him of the birth. He notes that Clawson did not testify whether she overheard this conversation, and he objects to the testimony as hearsay. We refuse to address this assignment of error because,

23

assuming the testimony to be inadmissible, the trial court and the court commissioner did not rely on the testimony when either denying the motion to vacate or the motion for a major modification. Neither the superior court judge nor the court commissioner mentioned the conversation in each's respective oral rulings. The order denying vacation of the default decree and the order denying adequate cause for a major modification incorporate no finding that the conversation occurred.

An error is harmless if the outcome of the proceeding would have been the same even if the error had not occurred. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). In determining whether an evidentiary error is harmless the court views the evidence actually considered by the trier of fact. *Yates v. Evatt*, 500 U.S. 391, 404, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991). Since the lower court did not consider the purported hearsay when rendering decisions, the testimony of Debra Clawson was harmless.

William Marx may argue that the alleged hearsay testimony influenced both the superior court judge and the court commissioner to find that he knew or should reasonably have known that he was the father sometime during 2010. Other evidence ably supports such a finding, however. Marx agrees he knew by early 2010 that Janelle Hunter was pregnant. He had an opportunity to contact Hunter to ask if he was the father and to pursue such knowledge immediately after the birth with a blood test. If he did not reasonably know by August 2010, he should have known by January 2011. Debra

24

Clawson served him with legal pleadings, in which Clawson named him as the "possible" father. Although Clawson employed the word "possible," Clawson named no other possible fathers. Marx should have pursued his parenthood then, if not earlier. Inadmissible evidence is harmless even in a criminal case with a burden of proof of beyond a reasonable doubt, if overwhelming untainted evidence supports the ruling. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011).

*Issue 4: Did the trial court err when refusing to vacate the default decree of custody?*

*Answer 4: No.*

William Marx maintains that the trial court erroneously ruled that, even if he had not been served with process, the passage of three years between entry of the default and Marx's motion to vacate negated any possibility of vacation. He asks us to vacate the default decree of nonparental custody because of this error. As noted earlier, we agree with Marx that, if Debra Clawson did not complete service on him, the trial court needed to vacate the default order regardless of the length of time that passed. A party may move to vacate a void judgment at any time, and lack of service renders a judgment void. *In re Marriage of Markowski*, 50 Wn. App. at 635-36 (1988); *In re Marriage of Leslie*, 112 Wn.2d at 618-19 (1989). We disagree, however, with the premise of Marx's argument. The trial court correctly ruled that Debra Clawson effectively served Marx.

William Marx next argues that the default decree was not binding on him because

25

he had yet been declared to be the father of Katerina. Because the decree did not

purportedly bind him, Marx seeks to vacate the default order. If we vacated the order, no

order would currently address the custody of Katerina.

CR 60 lists grounds on which a default order or judgment may be vacated. The

rule reads, in relevant part:

> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc.** On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;
> . . . .
> (3) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b);
> (4) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
> (5) The judgment is void;
> . . . .
> (7) If the defendant was served by publication, relief may be granted as prescribed in RCW 4.28.200;
> . . . .
> (9) Unavoidable casualty or misfortune preventing the party from prosecuting or defending;
> . . .; or
> (11) Any other reason justifying relief from the operation of the judgment.
> The motion shall be made within a reasonable time and for reasons (1), (2) or (3) not more than 1 year after the judgment, order, or proceeding was entered or taken. . . .

We list only the grounds that might possibly apply to William Marx's motion.

Unfortunately, Marx does not identify that ground, on which he relies. We will assume

26

he depends on the void judgment subsection, CR 60(b)(5), which posits no deadline for filing.

William Marx raises an interesting argument. Nevertheless, he forwards no law that supports the contention that a decree of custody is not binding on a father before a court adjudges the father to be the parent. RAP 10.3(a)(6) directs each party to supply, in his brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do not consider conclusory arguments that are unsupported by citation to authority. *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021, 297 P.3d 708 (2013). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). Therefore, we decline to address whether the default decree bound William Marx without an earlier parentage order.

We note a number of irregularities in the procedure leading to the entry of the nonparental custody order. Debra Clawson failed to sign the nonparental custody petition under oath. The trial court failed to enter a residential placement schedule. We do not address these abnormalities, in part, because we doubt that they prejudiced William Marx. We also do not address the irregularities because Marx cites no authority that supports a holding that the default decree is void because of the defect. Therefore, we

refuse to vacate the default decree of custody.

*Issue 5: Did the trial court commit error when refusing to grant William Marx's motion for a major modification in the placement of Katerina?*

*Answer 5: Yes. The trial court did not apply the correct standard.*

William Marx contends he need not show adequate cause for a major modification of Katerina's placement, because he was not found to be an unfit parent at the time of the nonparental custody decree. This last argument relies on Marx's constitutional rights as the biological father of Katerina. Based on this court's precedents, we agree with Marx's final argument. We hold that the trial court erred in failing to grant William Marx's petition for a major modification without the trial court finding that he was an unfit father or that placement of Katerina with Marx would result in actual detriment to the child's growth and development. We further hold that the appropriate remedy for the trial court error is not the vacation of the default decree of custody but a remand to the trial court to conduct an evidentiary hearing in light of the correct standard to be applied to Marx's motion for a major modification.

The trial court's demand that William Marx show adequate cause, under RCW 26.09.260, for a major modification in Katerina's placement prompts a preliminary discussion of constitutional rights. Parents have a fundamental right to autonomy in child rearing decisions. *In re Custody of Smith*, 137 Wn.2d 1, 13, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality

opinion). The United States Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without state interference. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). The liberty interest of parents may be the oldest of the fundamental liberty interests recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. at 65 (2000). Freedom of personal choice in matters of family life is a fundamental liberty interest protected by the due process clause of the Fourteenth Amendment, the equal protection clause of the Fourteenth Amendment, and the Ninth Amendment to the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).

The rights to conceive and to raise one's children are deemed "'essential,'" "'basic civil rights of man.'" *Stanley v. Illinois*, 405 U.S. at 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. at 399 (1923); *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942)). The custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder. *Stanley v. Illinois*, 405 U.S. at 651.

Since the custody of a child is a fundamental, constitutional right, state interference is justified only if the State can show that it has a compelling interest and

such interference is narrowly drawn to meet only the compelling state interest involved. *In re Custody of Smith*, 137 Wn.2d at 15 (1998); *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). This standard is known as the strict scrutiny test. *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005). Only under "extraordinary circumstances" does there exist a compelling state interest that justifies interference with parental rights. *In re Custody of Shields*, 157 Wn.2d 126, 145, 136 P.3d 117 (2006) (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 649, 626 P.2d 16 (1981)). The State lacks authority to redistribute infants to provide each child with the "best family." *Custody of Smith*, 137 Wn.2d at 20. The State also lacks the power to make significant decisions concerning the custody of children merely because it could make a "better decision." *Custody of Smith*, 137 Wn.2d at 20.

Arising from the clash between state authority and a parent's constitutional right is a standard that controls this appeal and all nonparental custody petition suits. The superior court may ultimately issue a custody order granting nonparental placement only if the court finds that the parent is unfit or placement with the parent would result in actual detriment to the child's growth and development. *In re Custody of B.M.H.*, 179 Wn.2d 224, 235, 315 P.3d 470 (2013); *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 344-45, 227 P.3d 1284 (2010); *Custody of Shields*, 157 Wn.2d at 142-43. This standard is necessary in order to adhere to the constitutional mandate that deference be accorded

30

parents in child custody disputes with nonparents. *Custody of E.A.T.W.*, 168 Wn.2d at 344; *Custody of Shields*, 157 Wn.2d at 142.

With this constitutional background, we address Washington's nonparental custody petition act, under which Debra Clawson initiated this action. In 1987, the Washington Legislature enacted the Parenting Act of 1987, chs. 26.09, 26.10 RCW, which redesigned chapter 26.09 RCW, the parenting chapter for marital dissolution actions. LAWS OF 1987, ch. 460. In turn, the legislature reenacted and continued the law relating to third party actions involving custody of minor children by adopting chapter 26.10 RCW in order to distinguish third party actions from parental disputes concerning placement of children. RCW 26.10.010.

Under RCW 26.10.030(1), a third party may file a nonparental custody petition "if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." One of the key provisions of the nonparental custody act is RCW 26.10.100. This section reads:

> The court shall determine custody in accordance with the best interests of the child.

Thus, the nonparental custody act incorporates the best interest standard declared unconstitutional in other settings.

In *Custody of Shields*, 157 Wn.2d 126 (2006), the Washington Supreme Court withheld a declaration that RCW 26.10.100 is unconstitutional and instead inserted

31

additional requirements into the nonparental custody petition setting. The Court recognized that the best interest standard fails to afford the natural parent required constitutional protections. But the statute is constitutional when adding the requirement that the parent be unfit or placement with the parent causes actual detriment to the child's growth and development. The Supreme Court reversed the trial court's grant of the child to a stepparent because, although the trial court referred to an actual detriment standard, the record reflected that the trial court applied a best interest standard. The requisite showing by the nonparent is substantial. *Custody of Shields*, 157 Wn.2d at 145.

The phrase "parental unfitness" employs vacuous words. Some Washington cases introduce other vocabulary to assist lower courts in resolving custody disputes, although the alternative terminology still affords minimal particularity in determining unfitness. In the context of a termination proceeding when the State must also show current unfitness, the State must prove that the parent's parenting deficiencies prevent the parent from providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. RCW 13.34.020; *In re Welfare of A.B.*, 181 Wn. App. 45, 58-59, 323 P.3d 1062 (2014). The Evergreen State Supreme Court has also defined parental unfitness as being unable to meet a child's basic needs, *In re Custody of B.M.H.*, 179 Wn.2d at 236 (2013), or lacking the necessary capacity for giving parental care. *In re Welfare of Aschauer*, 93 Wn.2d 689, 694, 611 P.2d 1245 (1980). Unfit parents include parents causing nonaccidental injury, neglect, death, sexual abuse and cruelty to children

32

or parents who deprive a child of his or her right to conditions of minimal nurture, health, and safety. RCW 26.44.010; *In re Custody of B.M.H.*, 179 Wn.2d at 236.

The expression "actual detriment to a child's growth and development" also lacks concreteness, but the Washington courts supply no alternative terminology. The state Supreme Court has observed that whether placement with a parent will result in actual detriment to a child's growth and development is a highly fact-specific inquiry, and precisely when actual detriment outweighs parental rights must be determined on a case-by-case basis. *Custody of Shields*, 157 Wn.2d at 143 (2006). When this heightened standard is properly applied, the requisite showing required by the nonparent is substantial and a nonparent will be able to meet this substantial standard in only "'extraordinary circumstances.'" *Custody of Shields*, 157 Wn.2d at 145 (quoting *In re Marriage of Allen*, 28 Wn. App. at 649). Examples include (1) when a deaf child needed a caregiver who could effectively communicate with the child and the father was unable to do so, (2) when a suicidal child required extensive therapy and stability at a level the parents could not provide, and (3) when a child who had been physically and sexually abused required extensive therapy and stability at a level the parent could not provide. *In re Custody of B.M.H.*, 179 Wn.2d at 236.

Just as the marital dissolution chapter offers a divorced parent an opportunity to modify a custody or residential placement order, the chapter addressing nonparental

custody actions affords an opportunity for a parent to seek a modification of the custody

decree. RCW 26.10.190(1) declares:

> The court shall hear and review petitions for modifications of a parenting plan, custody order, visitation order, or other order governing the residence of a child, and conduct any proceedings concerning a relocation of the residence where the child resides a majority of the time, pursuant to chapter 26.09 RCW.

The controlling statute, RCW 26.09.260, for modifying a custody decree in a marriage

dissolution action reads, in part:

> (1) . . . the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child. . . .
> (2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
> (a) The parents agree to the modification;
> (b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan; [or]
> (c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

When addressing William Marx's motion to modify the nonparental custody decree, the

trial court employed the standard embedded in RCW 26.09.260. We conclude use of this

standard to be error.

Even more than a child custody decree in a marriage dissolution action, a decree awarding custody to a nonparent under chapter 26.10 RCW is never permanent. Nonparental custody is inherently impermanent:

> A nonparent custody order confers only a temporary and uncertain right to custody of the child for the present time, because the child has no suitable legal parent. When and if a legal parent becomes fit to care for the child, the nonparent has no right to continue a relationship with the child.

*In re Parentage of J.A.B.*, 146 Wn. App. 417, 426, 191 P.3d 71 (2008). More importantly for this appeal, since the nonparental custody proceeding provided by chapter 26.10 RCW constitutionally divests a parent of rights only if the trial court finds parental unfitness or actual detriment, a parent against whom the constitutional standard is not found to have been proved has a liberty interest that remains undiminished. *In re Custody of T.L.*, 165 Wn. App. 268 (2011).

In *T.L.*, Tia Link's six-year-old son had lived with his grandmother for most of his life because Link had not been stable or responsible enough to meet T.L.'s needs. The grandmother petitioned for nonparental custody of T.L., which Link resisted for a year. Eventually, however, Link filed a joinder in her mother's petition. The trial court entered agreed findings, conclusions, and orders. Link claimed she had relinquished control over T.L. only temporarily, with the understanding that she could have her son back when she was stable. The grandmother denied any understanding that her custody of T.L. was temporary. When Tia Link filed a petition to modify the custody and residential schedule

based on her professed success in achieving stability, a court commissioner concluded, and the superior court affirmed, that Link had not demonstrated a statutorily required change in T.L.'s or his grandmother's circumstances.

In *T.L.*, we held that the modification standards and process provided by RCW 26.09.260(1) interfered with Tia Link's right to rear her son and failed strict scrutiny analysis when T.L.'s grandmother had never demonstrated that Link was an unfit parent or that placing T.L. with her would result in actual detriment to his growth and development. We recognized that the requirement to prove a substantial change in the child's or nonmoving parent's circumstances reflects a legislative desire to minimize custody litigation between divorced parents, but held that, in a case such as this, it is constitutional error to require a parent seeking restored custody of her or his child to satisfy the requirements of RCW 26.09.260. We recently followed the teachings of *T.L.* in *In re Custody of Z.C.*, No. 32431-1-III (Wash. Ct. App. Dec. 15, 2015).

The trial court did not enter the 2011 custody decree favoring Debra Clawson and findings supporting the decree after a contested hearing during which William Marx presented evidence. Marx may argue that the lack of a contested hearing alone requires a major modification to the decree. We question the validity of the argument, since he enjoyed the opportunity in 2011 to litigate his parental rights. We vacate the trial court's 2014 order denying the major modification on other grounds.

In the February 3, 2011, findings of fact supporting the nonparental custody decree, the trial court entered no finding that William Marx was an unfit parent or that placement with him would constitute actual detriment to the child's development. The trial court entered a finding that William Marx is not a "suitable" parent. We recognize some similarity in the meaning of the words "unfit" and "unsuitable." Nevertheless, we do not equate unsuitability with unfitness. RCW 26.10.032 demands that, in order to establish adequate cause to proceed with a nonparental custody action, the petitioner must (1) show the child is not in the physical custody of a parent or the *parents are unsuitable* custodians and (2) allege specific facts that, if proven true, *establish the parent is unfit* or the child would suffer actual detriment if placed with the parent. The statutory scheme thus distinguishes between an unsuitable parent and an unfit parent. The term "unsuitable" may extend to a deficiency in skills; whereas the word "unfit" could extend to a total lack of qualifications. Assuming unsuitability equates to unfitness, Debra Clawson does not show this court that she provided the superior court, in 2011, with any, let alone clear and convincing, evidence to substantiate a finding that Marx was an unsuitable father.

The trial court, in the 2011 decree, also found that Katerina was removed from parental care due to findings of neglect and/or abuse by CPS, and that both parents failed to meet minimum standards of care for Katerina and failed to complete services. These findings could not apply to William Marx, however. He never provided the care for

37

Katerina. CPS never entered any findings with regard to Marx. The record does not establish that any court or government agency ordered Marx to submit to services.

The findings of fact and conclusions of law signed by the trial court in 2011 also included a finding that William Marx's visitation should be limited because of his alleged conviction of a child assault of third degree. Nevertheless, Debra Clawson does not claim that she provided the superior court in 2011 with any evidence of a criminal conviction. RCW 26.10.135 provides: "Before granting any order regarding the custody of a child under this chapter, the court shall consult the judicial information system, if available, to determine the existence of any information and proceedings that are relevant to the placement of the child." The record does not establish that the trial court performed the requisite consultation in 2011.

## CONCLUSION

We remand to the trial court for further proceedings. Unless Debra Clawson can show during an evidentiary hearing that William Marx is an unfit father or that placement of Katerina with Marx would result in actual detriment to the child's growth and development, Marx's petition for a major modification in the residential placement of Katerina should be granted.

No. 32597-1-III
*In re Custody of K.R.H.*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

39